UNITED STATES of America ex rel.
Melvin GERALDS, Petitioner,

v.

John T. DEEGAN, Warden, Sing Sing
Prison, Ossining, New York,
Respondent.

No. 67 Civ. 3198.

United States District Court
S. D. New York.

Nov. 12, 1968.

Melvin Geralds, pro se.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, Albany, N. Y., for respondent; Michael H. Rauch, Asst. Atty. Gen., New York City, of counsel.

OPINION

MacMAHON, District Judge.

Petitioner, presently confined at Sing Sing Prison, moves for a writ of habeas corpus under 28 U.S.C. § 2254, attacking collaterally a conviction for robbery, grand larceny and assault and the sentence imposed upon him by the Nassau County Court on May 7, 1965 after a jury trial. Allegedly, the conviction was obtained in violation of petitioner's constitutional rights under the fifth, sixth and fourteenth amendments.

Specifically, petitioner claims (1) failure to prove a prima facie case, (2) failure to prove petitioner's guilt beyond a reasonable doubt, (3) double jeopardy, (4) denial of counsel at pre-trial identification and (5) suggestive pre-trial confrontation by the victims which was conducive to mistaken identification.

■ Claims (1) and (2) fail to raise a federal question.[1] As to claim (3), petitioner argues that dismissal of the complaint by the Nassau County District Court and his subsequent indictment for the same crime violated his constitutional protection against double jeopardy. Petitioner is referring to a preliminary felony examination by that court functioning as a magistrate on the question of probable cause to detain the prisoner pursuant to §§ 186 through 207 of the New York Code of Criminal Procedure. Dismissal of a complaint and discharge of a prisoner for want of probable cause by an examining magistrate or commissioner does not bar subsequent indictment or conviction on the same charge. This is both New York[2] and federal law.[3] Thus, petitioner's claim (3) is without merit.

■ Claim (4) also must be rejected since petitioner was convicted prior to the decisions holding that pre-trial identification is a "critical stage" of a criminal proceeding actuating the right to counsel.[4]

■ This leaves for consideration the question of whether petitioner is entitled to relief on claim (5)—that the identification at trial in his case was so infected with an unfair pre-trial confrontation for identification that he was denied due process. This is a recognized ground of attack independent of the claim of right to counsel.[5]

■ Whether petitioner was denied due process depends on (a) whether, under all the circumstances, the pre-trial confrontation was so unnecessarily suggestive and conducive to mistaken identification[6] that it offends the fundamental standards of decency, fairness and justice;[7] (b) whether the identification at trial had an independent origin;[8] and (c) whether, in any event, the introduction of the evidence was harmless error.[9]

1. Questions as to the sufficiency of the evidence or as to the quantum of evidence necessary to satisfy a burden of proof do not raise federal issues. Sunal v. Large, 332 U.S. 174, 182, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947); Genovese v. United States, 378 F.2d 748 (2d Cir. 1967); Rhay v. Browder, 342 F.2d 345 (9th Cir. 1965); Faust v. North Carolina, 307 F.2d 869 (4th Cir. 1962), cert. denied, 371 U.S. 964, 83 S.Ct. 547, 9 L. Ed.2d 511 (1963). In order to present a federal issue, there must be "no evidence" to support the conviction. Garner v. Louisiana, 368 U.S. 157, 163–164, 173–174, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961); Genovese v. United States, supra.

2. People v. Saccenti, 14 N.Y.2d 1, 247 N.Y.S.2d 479, 196 N.E.2d 885 (1964); People ex rel. Hirschberg v. Close, 1 N.Y.2d 258, 152 N.Y.S.2d 1, 134 N.E.2d 818 (1956).

3. United States ex rel. Rutz v. Levy, 268 U.S. 390, 394, 45 S.Ct. 516, 69 L.Ed. 1010 (1925); United States ex rel. Polvin v. Hecht, 48 F.2d 90 (2d Cir. 1931); United States ex rel. Combs v. Denno, 231 F.Supp. 942, 944 (S.D.N.Y.1964), aff'd, 357 F.2d 809 (2d Cir.), cert. denied, 385 U.S. 872, 87 S.Ct. 144, 17 L.Ed.2d 99 (1966).

4. Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1199 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

5. Stovall v. Denno, supra, 388 U.S. at 302, 87 S.Ct. 1967; Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966).

6. Stovall v. Denno, supra, 388 U.S. at 302, 87 S.Ct. 1967.

7. Rochin v. California, 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396 (1952); Malinski v. New York, 324 U.S. 401, 416–417, 65 S.Ct. 781, 89 L.Ed. 1029 (1945).

8. United States v. Wade, supra, at 242, 87 S.Ct. 1926.

9. United States v. Wade, supra; Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Our inquiry is directed first to whether the conduct of the confrontation was unnecessarily suggestive and conducive to mistaken identification. The answer depends upon the totality of the surrounding circumstances. We look now to those circumstances.

## THE CRIME

The owners of the Azzarone Construction Corporation, O'Neil Bouknight and George Bock, were assaulted and robbed of more than $12,000 by two armed Negroes on May 23, 1963, at the office of their company in Mineola, Nassau County, New York, in the evening between 5:30 P.M. and 5:50 P.M. It was daylight, and the office was illuminated with fluorescent lights. Bouknight and Bock were alone, all other employees having left for the day.

Immediately prior to the incident, Bock was in an office called "the estimating room," and Bouknight was in an adjoining toilet. Earlier that day, the office manager had withdrawn money for the firm's payroll, placed it into envelopes, put the envelopes into night deposit bags, and set the bags on a shelf in a closet located in the estimating room. Bock had $100 on his person, and Bouknight had $70.

The incident happened as Bock was at a desk talking on the telephone. A Negro man with a gun approached the desk and told Bock to hang up and get down on the floor.[10] Bock then noticed a second Negro man, armed with a knife, enter the doorway and, hearing a flush, went to the toilet door. As Bouknight opened the toilet door, the man with the knife, standing five or six feet away, said: "This is a stickup. Get in the other room on the floor." The man then grabbed Bouknight by the shoulder, stepped behind him, and shoved him into an adjoining room where the other man pushed him to the floor. When Bock and Bouknight were facedown on the floor, the man with the knife tied their hands behind their backs, taped their mouths, and tied their feet. The man with the knife asked, "Where's the money?," went into a back room, and kept repeating "Where's the money?" Bouknight tried to tell him, but when he moved to do so was slapped on his face. The man with the gun then took the wallets from the back pockets of both victims. He then walked into the front room, said to the man with the knife, "Come on, I have it," and then both left. The victims freed themselves, and Bouknight telephoned the police. The entire incident lasted from five to seven minutes.

## DESCRIPTION OF THE ROBBERS

Within five minutes after the occurrence, police officers came to the' premises. The victims gave detailed descriptions of the robbers which were written down by the police. According to the victims, the man with the knife was a very light complexioned Negro, with a round shaped face and brown eyes "wide open." He was about six feet tall and weighed about 170 pounds. He wore a beige knit shirt with a dark collar, dark grey or dark brown trousers, and a pork pie hat.

Later that same evening, at about 9:00 o'clock, the victims went to the police station where they remained until about 2:30 A.M. They spoke to several detectives, looked at photographs, and repeated detailed descriptions of the men to the police artist. They remained with the artist for two or three hours while he made notes and, with the guidance of the victims, drew a composite picture of the man with the knife.[11] Photographs were made of the picture.

10. The man with the gun, apparently never apprehended, was not a defendant at the trial. He was described, however, by the victims as about five feet eight inches tall, rather stockily built, with a short neck, very dark complexion, and an athletic type. Bouknight also gave a detailed description of the man's clothing.

11. A composite sketch of the man with the gun was made in similar fashion the following morning.

## CONFRONTATION FOR IDENTIFICATION

Twenty days later, on the afternoon of June 12, 1963, at the request of the police, the victims went to the Third Precinct station house in Mineola. They spoke to several detectives and police officers who said they had a suspect and would like them to observe him. The record is unclear whether petitioner then had counsel, but in any event none was present. There was no lineup. Instead, the victims looked through a one-sided mirror located in a door and saw a white man bring a Negro into an adjoining room. The victims viewed the Negro for about five minutes. At their request, relayed through a detective, he put on a pork pie hat and, with the door ajar, said: "Where's the money?" Nothing else was said. Both victims heard and recognized the voice as the voice of the man who at the time of the robbery kept asking "Where's the money?" Nonetheless, Bouknight was "not absolutely certain" that the Negro was "the man with the knife," but was "almost 100% positive that's the man," while Bock was "relatively sure, not positive."

The victims saw petitioner for a second time the next day, when they were called to the Nassau County police headquarters in Mineola. Again, there was no lineup. Rather, the victims viewed petitioner for two or three minutes, and there was a conflict in their testimony as to whether he was alone or with a white detective.

The victims saw petitioner for a third time for about half an hour on June 17, 1963 at a felony examination held in the Nassau County District Court in Mineola.

## IDENTIFICATION UPON THE TRIAL

The prosecution did not offer the prior identification into evidence upon the trial but relied upon an identification of the petitioner by the victims in open court. The earlier pre-trial identification was elicited by defense counsel upon cross-examination, and some inconsistencies in minor details were developed between the victims' testimony and earlier descriptions given by them. Bouknight testified that, when he first observed petitioner at the precinct station house, he was reasonably sure, but not absolutely certain, that petitioner was the man who held the knife. Nor was he "100% positive" that the man he identified in court was the man who held the knife at the time of the crime. Bock testified that he was relatively sure that petitioner was the man who held the knife. The victims' testimony concerning the identification of petitioner at police facilities was basically corroborated by the sole defense witness, detective James Moran.

On redirect examination, the descriptions given and the artist's sketch, drawn on the night of the robbery, were received in evidence, and both victims testified that they recognized petitioner's voice at the first confrontation as that of the man who had held the knife and asked "Where's the money?" during the robbery.

Defense counsel, in his summation, emphasized that the question of identity was the "sole" issue for the jury. He stressed the victims' doubts, implied police pressure from two confrontations, deplored the lack of a lineup, highlighted discrepancies in the victims' stories, and questioned their observational abilities while under the fear and excitement of the robbery. He left nothing unsaid in his condemnation of the pre-trial confrontation as unfair, suggestive and conducive to irreparable mistaken identification. He argued that it was so contaminated with suggestion that the victims' identification at trial was merely a replay of a solidified mistake, riddled with doubt and totally unreliable.

The prosecution's summation also focused on the question of identity, arguing that the victims' very unwillingness to be absolutely sure certified that they were conscientious, careful and credible witnesses. Pointing to the untainted de-

scriptions and sketch of the composite picture made on the night of the robbery, he asked the jury to decide whether petitioner fitted the description or resembled the picture beyond a reasonable doubt.

The court, in its charge, thoroughly and fairly summarized the evidence pro and con relating to identification of petitioner and squarely put the issue to the jury.[12] The jury resolved the issue against petitioner.

## DUE PROCESS

We turn now to petitioner's contention that the conduct of the confrontation for identification was unfair and suggestive.

■ Individual confrontations for identification, rather than a lineup, are widely condemned, especially when, as in this case, there is no urgency and full opportunity to prepare for a lineup.[13] We think it plain that the totality of attendant circumstances show that the confrontation here was fraught with hazards of serious unfairness. It was strongly suggestive and conducive to mistaken identification to summon the victims to the precinct to view a suspect twenty days after the robbery and present them with a single Negro in obvious custody of a white policeman when the victims had previously described the culprit as a Negro. The situation, without more, clearly conveyed the suggestion that the Negro presented was believed by the police to be the culprit.[14] The vice was heightened by the victims' identification of the suspect in each other's presence,[15] and the opportunity for objective observation was destroyed by exciting the victims' imagination when the suspect, still alone without others for image or voice comparison, donned the culprit's pork pie hat and spoke his words, "Where's the money?"[16] The spotlight of suggestion could hardly be focused with greater intensity than it was here. We have no difficulty, therefore, in finding that the pre-trial confrontation was unnecessarily and unfairly suggestive and conducive to mistaken identification.[17] It does not follow, however, that the invalid confrontation resulted in mistaken identification then or later, or in such unfairness upon the trial that it infringed petitioner's right to due process of law.

Whether, in the circumstances, the petitioner was denied due process depends

12. "Now there is a question of identity here also for you to decide. You will recall there was evidence adduced to show here that if the crime was committed, that it was not the defendant Geralds who committed it, the testimony seeming to be that he was not the person who committed the crime alleged. To sustain a conviction of the defendant, the evidence must be such as to enable you, the jury, to say beyond a reasonable doubt that the defendant Geralds was the assailant, and no other person was the assailant, who participated in that robbery.

"There can be no conviction if the identity of the defendant Geralds, now, as the actual perpetrator of the crime charged, is not satisfied and established to your satisfaction, beyond a reasonable doubt. This means that the People are obligated to show the defendant's participation in the act and that it was not the act of another. You must be satisfied beyond a reasonable doubt that the defendant Geralds actually was at the scene and committed the crime charged.

"On the other hand, if you are satisfied, beyond a reasonable doubt, that Geralds was there, the crime was committed and you are satisfied he was actually present, if you are satisfied beyond a reasonable doubt as to these facts, you can find the defendant Geralds guilty." Trial transcript, pp. 517–18.

13. Stovall v. Denno, supra, 388 U.S. at 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

14. United States v. Wade, supra, 388 U.S. at 234, 87 S.Ct. 1926, 18 L.Ed.2d 1178.

15. Id., at 234 n. 25, 87 S.Ct. 1951.

16. There was no denial of petitioner's privilege against self-incrimination by compelling him to wear a pork pie hat or to speak the words. Such acts are not testimonial in nature and do not violate the privilege against self-incrimination. United States v. Wade, supra, at 221, 87 S.Ct. 1951; Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

17. United States v. Wade, supra, at 234–235, 87 S.Ct. 1926.

on whether the witnesses' in-court identification was the fruit of the tainted confrontation, or whether it was grounded on an independent source "sufficiently distinguishable to be purged of the primary taint." [18]

■ In our search for the true basis of the witnesses' in-court identification, we note at the outset that although the confrontation was suggestive, the witnesses here did not appear to have been affected. Neither of the victims was ever absolutely sure or positive in his identification of petitioner. At the first pre-trial confrontation, they were reasonably sure but not certain. The second confrontation failed to vanish their doubts, and their uncertainty persisted throughout the trial. Thus, though suggestion flawed the confrontation, the record refutes the notion of susceptible victims dutifully echoing a crystallized mistaken identification. [19]

■■ Even if we assume that the victims did yield to illegal suggestion, it is still open to the prosecution to prove by clear and convincing evidence that the in-court identification had an independent origin. [20] The Supreme Court suggests guiding criteria for application of this test. [21] For example: (1) prior opportunity of the witnesses to observe the alleged criminal act; (2) the existence of any discrepancy between any pre-lineup description and the actual appearance of the accused; (3) any identification prior to lineup of another person; (4) identification by picture prior to lineup; (5) failure to identify the accused on a prior occasion, and (6) lapse

of time between the act and the identification.

Ample opportunity to observe the culprit, or to hear his voice at the time of the crime or prior selection of a picture of the accused have been held to be circumstances warranting a finding that the in-court identification was independently based despite a tainted pre-trial confrontation for identification. [22]

Here, the victims were in close proximity to the culprit under good lighting conditions for more than five minutes. They heard him repeatedly say "Where's the money?" Thus, they had an ample opportunity to observe his features, his complexion, his eyes, his weight, his height and his clothes, and to imprint his image and demeanor upon their minds. They also had an opportunity to hear the sound, inflection and timbre of his voice. Immediately after the crime, and again for several hours during the evening of its occurrence, with the culprit's appearance fresh in mind, the victims gave a detailed description of the culprit which was recorded by the police and available at trial. More significantly, the victims guided the police artist in his construction of a composite picture. Such a picture, the embodiment of the witnesses' mental image, is even more clear and convincing evidence of an independent origin for the in-court identification than the prior selection of a photograph. We think these procedures provided adequate safeguards against irreparable mistaken identification, for the witnesses' descriptions and the composite picture were presented to the jury,

18. United States v. Wade, supra, at 241, 87 S.Ct. at 1939; Hoffa v. United States, 385 U.S. 293, 309, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

19. Some have suggested that once a witness has picked out the accused, he is not likely to go back on his word. See United States v. Wade, supra, 388 U.S. at 229 n. 8, 87 S.Ct. 1926.

20. United States v. Wade, supra, at 240, 87 S.Ct. 1926.

21. Id., at 241, 87 S.Ct. 1926.

22. Stovall v. Denno, supra; Hanks v. United States, 388 F.2d 171, 173 (10th Cir. 1968); Wise v. United States, 383 F.2d 206, 210 (D.C.Cir. 1967), cert. denied, 390 U.S. 964, 88 S.Ct. 1069, 19 L.Ed.2d 1164 (1968); Crume v. Beto, 383 F.2d 36, 40 (5th Cir. 1967).

and apparently it decided that petitioner fitted the descriptions and resembled the picture.

Moreover, all the other factors enunciated in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1178 (1967), were presented, probed and argued at trial. The discrepancies in the untainted descriptions and the accused's actual appearance were minor and insignificant. There was no identification of someone else, nor failure to identify the accused, on a prior occasion. Stressing that the sole issue for the jury was the question of identity, defense counsel exploited every factor in petitioner's favor and every weakness in the People's case. Finally, the court charged that there was a question of identity and that in order to convict, the jury must be convinced beyond a reasonable doubt that petitioner was actually the one who committed the act. In finding petitioner guilty, the jury therefore necessarily resolved the identity issue against him.

We conclude that the State has satisfied its burden of proving, by clear and convincing evidence, an independent and untainted origin of the witnesses' in-court identification of petitioner under all the relevant criteria. Petitioner has had a full and fair hearing on the issues in the state courts, and the facts are in the record and undisputed. There is, therefore, no reason for a hearing in this court.[23] We find that the tainted pretrial identification procedure did not infect the trial identification and that the latter had an untainted and independent origin. Since we hold that there was no denial of due process, we do not reach the question of "harmless error."[24]

Accordingly, petitioner's application for a writ of habeas corpus is denied in all respects, and a certificate of probable cause will not be issued by this court.

So ordered.

23. Townsend v. Sain, 372 U.S. 293, 314, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

24. Chapman v. California, supra.