**UNITED STATES of America ex rel. Melvin GERALDS, Petitioner,**

v.

**John T. DEEGAN, Warden, Sing Sing Prison, Ossining, New York, Respondent.**

Nos. 67 Civ. 3198, 68 Civ. 4333 and 68 Civ. 4813.

United States District Court
S. D. New York.

Dec. 12, 1969.

Nassau County Law Services Committee, Inc., Mineola, N. Y., for petitioner; Allen Redlich and Leonard S. Clark, Mineola, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Albany, N. Y., for respondent; Hillel Hoffman, Asst. Atty. Gen., New York City, of counsel.

## OPINION

MacMAHON, District Judge.

Melvin Geralds petitions for three separate writs of habeas corpus, attacking two convictions for robbery, grand larceny and assault. The history of these proceedings has been somewhat confused, to say the least, but all three writs have now been consolidated and are before us for decision.

The first conviction was for the robbery of the Azzarone Construction Corporation on May 23, 1963. Petitioner was indicted, convicted by a petit jury and sentenced by the Nassau County Court on May 7, 1965.

The second conviction was for a subsequent robbery of Mary Sperling and Ida Hartley occurring on May 15, 1964. Petitioner was again indicted, convicted by a petit jury and sentenced by the Nassau County Court on May 7, 1965, the same day as his sentence on the first conviction. The sentences were to run concurrently, and petitioner is presently serving both at Sing Sing Prison, in Ossining, New York.

Petitioner challenges both convictions on the same grounds. First, he asserts that the Nassau County selection system for both the grand and petit juries involved deliberately discriminated against Negroes, laborers, blue collar workers, members of the lower economic class and those owning less than $250 in property, and, second, he claims that the pre-trial identifications were unnecessarily suggestive and, therefore, tainted the in-court identifications.

We have previously denied petitioner's claim of the use of impermissible pretrial identification procedures as to the first conviction. United States ex rel. Geralds v. Deegan, 292 F.Supp. 968 (S.D. N.Y.1968). We have also previously denied his jury selection claim as to the second conviction by an unreported decision dated January 13, 1969, filed in 68 Civ. 4333. However, we have not yet considered petitioner's claim of discriminatory jury selection as to the first conviction, nor his claim of impermissible pre-trial identification procedures as to the second.

The Court of Appeals remanded the matter to us "for consideration of the identification and jury selection issues and such hearing as the district court may deem necessary." The remand apparently related only to the second conviction, but since the claim of discriminatory jury selection is identical as to both convictions and also identical to the claim of discriminatory jury selection raised in the petition for a writ of habeas corpus referred to us by Judge Motley (68 Civ. 4813), we will consider that question on all three petitions for a writ of habeas corpus.

Petitioner claims that during the years 1963 to 1965, when he was indicted and convicted in both cases, the Nassau County grand and petit juries determining his fate, were selected in a manner that discriminated against Negroes, laborers, blue collar workers, members of the lower economic class and persons possessing less than $250 in property.

The same claim was made in the state court by petitioner's challenge to the array immediately before his trial for the second robbery. An evidentiary hearing was held on March 8, 1965, and the court found against petitioner.

Joseph B. Dowler, Nassau County jury commissioner since 1958, testified at the state court hearing and also upon a post-conviction hearing held before this court on September 2, 1969. He explained the grand and petit jury selection process used in Nassau County during the years in question.

Names of prospective jurors were selected at random from voter registration lists, tax assessment rolls and the Nassau County telephone book. The lists contained no indication of race, occupation or social position. Proportionate geographic representation throughout the county was obtained by dividing the county into 100 communities and calling a number of persons proportionate to the communities' percentage of the county's total population.

Persons selected were notified by mail and instructed to appear at the commissioner's office, where they were given a questionnaire containing 20 questions, one of which inquired about the amount of property owned.[1] Based on their answers and a short interview, persons were either rejected or accepted for petit jury service. The names of all persons accepted were placed on cards and drawn from a drum to fill panels for various courts of Nassau County.

The commissioner testified that he had no way of knowing precisely how many Negroes were called for jury duty or how many actually served, but his best recollection was that "thousands" were called and served, and there was no evidence to the contrary.

The names of prospective grand jurors were selected from the names contained on the active petit jury list. Those selected were given a questionnaire to answer, and the only challenged questions are 7 through 12 concerning occupation, employer, place of employment, length of service and previous employment. There was no indication on the form of the applicant's race.

■ An indictment returned, or a verdict rendered, by a jury from which a certain race or a certain social group was deliberately and arbitrarily excluded is a violation of the defendant's constitutional rights and, therefore, must be vacated on a petition for habeas corpus.[2]

It has been generally assumed, and on occasion specifically stated, that only those defendants who are members of the excluded group have standing to object to the group's systematic and deliberate exclusion.[3] A recent line of cases, however, holds that a defendant is entitled to a fair and impartial jury representing a cross-section of the community, and that he is denied that right when there is arbitrary, systematic exclusion of a certain group, even though he is not a member of the excluded group.[4]

It is unnecessary for us to determine the question of standing, for here petitioner fails to establish a prima facie case of deliberate and systematic exclusion of certain groups.

■ The burden of proving deliberate and systematic exclusion is on petitioner. If petitioner, however, can establish a prima facie case, the burden is said to shift to the state to rebut the facts presented or to offer a rational basis for the excluded classification.[5]

---

1. Petitioner does not challenge the other questions, and all of them are in substantial conformity with § 661 of the New York State Judiciary Law, McKinney's Consol.Laws, c. 30, relating to the statutory requirements for jurors.

2. Whitus v. Georgia, 385 U.S. 545, 549–550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967).

3. Fay v. New York, 332 U.S. 261, 284, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947).

4. Allen v. State, 110 Ga.App. 56, 137 S.E.2d 711 (1964). See Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966); State v. Madison, 240 Md. 265, 213 A.2d 880, 885 (1965); Schowgurow v. State, 240 Md. 121, 213 A.2d 475 (1965). But see Salisbury v. Grimes, 406 F.2d 50 (5th Cir. 1969); Mosley v. Smith, 404 F.2d 346 (5th Cir. 1968).

5. Whitus v. Georgia, supra, 385 U.S. at 550, 87 S.Ct. 643.

■ A prima facie case of purposeful discrimination is established by either of two lines of proof: (1) statistics, or other credible evidence, showing total exclusion of a class, such as Negroes, over a lengthy period of time;[6] or (2) evidence not of total exclusion but of a disproportion between the percentage which the class constitutes of the total population and the percentage of the class represented on juries in a given area, coupled with some facts indicating that the sources of selection of jurors were segregated.[7]

■ Here, except for those owning less than $250 in property, petitioner does not claim total exclusion of any of the allegedly excluded groups. He must, therefore, present evidence showing disproportionate representation of the class on juries, along with segregated sources, in order to establish a prima facie case of purposeful discrimination. Thus, he must introduce statistics, or other credible evidence, showing that the percentage of Negroes, laborers, blue collar workers and members of the lower economic class represented on juries is disproportionate to their respective percentages of the total population of Nassau County. Additionally, he must show that the selection was based on a source that segregated people according to race, occupation or economic standing.[8]

As to the exclusion of Negroes, his only evidence is that from 1958 to 1964 there was only one juror from New Cassel, a Negro community in Nassau County. Petitioner offers no evidence of the ratio between the percentage of Negroes on juries in any of the years in question and the percentage of Negroes in Nassau County's total population. He did not offer even a sampling, nor did he introduce evidence as to the number of Negroes from Nassau County's other largely black communities, such as the villages of Hempstead, Freeport and Roosevelt.

Moreover, the sources for the selection of prospective jurors were the telephone book, the tax assessment list and the voter registration list. None of these lists indicates a person's race, as in the cases of exclusion based on segregated tax or voter registration lists.[9]

Petitioner fails, therefore, to present a prima facie case of deliberate and systematic exclusion of Negroes from the Nassau County jury system.

Petitioner, likewise, does not claim total exclusion of laborers, blue collar workers or members of the lower economic classes. Rather, he introduced statistics comparing the percentage of blue collar workers on juries for the years 1958 through 1968 with the percentage of Nassau County residents who were blue collar workers.

According to petitioner's statistics, blue collar workers constituted 27.9% of the county's total population from 1958 to 1968. The percentage of blue collar workers on grand juries, however, varied from a low 8.8% in 1963, the year petitioner was indicted for the first robbery, and 10% in 1964, the year when he was indicted for the second robbery. The high for the ten-year period was 16.3% in 1967.

Petitioner does, therefore, introduce some evidence of statistical disproportion between the percentage of blue collar workers on grand juries and the percentage of blue collar workers in Nassau

6. Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Patton v. Mississippi, 332 U.S. 463, 466, 68 S.Ct. 184, 92 L.Ed. 76, 1 A.L.R.2d 1286 (1947); Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Labat v. Bennett, *supra*, 365 F.2d at 725.

7. Sims v. Georgia, 389 U.S. 404, 407–408, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); Whitus v. Georgia, *supra*, 385 U.S. at 550–552, 87 S.Ct. 643; Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953).

8. Whitus v. Georgia, *supra*, 385 U.S. at 550–552, 87 S.Ct. 643.

9. Sims v. Georgia, *supra*, 389 U.S. at 407–408, 88 S.Ct. 523; Whitus v. Georgia, *supra*, 385 U.S. at 550–552, 87 S.Ct. 643; Avery v. Georgia, *supra*.

County's total population. He does not, however, introduce any evidence of statistical disproportion between the percentage of blue collar workers on petit juries and the total percentage of blue collar workers in the county.

Further, petitioner claims that the use of tax assessment lists, voter registration lists and the Nassau County telephone book placed a premium on owning real property or a telephone. This is not, however, analogous to the cases holding that disproportion plus the use of segregated lists constitute a prima facie case of purposeful discrimination.[10] The lists relied on here did not distinguish between white and blue collar workers. Petitioner claims, but offers no proof to show, that more white than blue collar workers own real property. In these days when blue collar workers are represented by strong unions which constantly gain economic advances for their members, while white collar workers must fend for themselves, we cannot accept petitioner's claim without empirical evidence to support it.

Likewise, there is no evidentiary support for petitioner's claim that there is a disproportion between the number of white and blue collar workers owning telephones. Moreover, the source most often used for prospective jurors was the voter registration lists, and neither blue collar workers nor members of lower economic groups are confronted with any obstacle to registration.

■ We conclude that the lists used here did not result in a distinction based on race, wealth, occupation or social position and, therefore, were not the basis for the deliberate and systematic exclusion of any group from jury service, as are lists which separate whites from blacks.

■ Finally, petitioner argues that the New York statute then in force,[11]

requiring jurors to own $250 in property, deliberately and systematically operated to exclude poor people.

It might be noted that only 10 of 174,-379 persons called from 1960 through 1965 claimed they owned less than $250 in property, that is 5/1000 of 1%. Surely this infinitesimal percentage did not amount to the deliberate and systematic exclusion of a large social group, nor did it deny petitioner a jury which represented a fair cross-section of Nassau County.

The constitutionality of this statute had been upheld by the United States Supreme Court before the indictments and verdicts involved here,[12] and the statute was subsequently repealed by the New York State Legislature. A redetermination of its constitutionality would, therefore, have no prospective, but merely retroactive, application.

The application of this statute had only a negligible affect on the composition of juries in Nassau County and, consequently, did not affect the integrity of the fact-finding process. Since the statute had statewide application, were we now to hold it unconstitutional, it would require a re-trial of all criminal defendants convicted by New York juries prior to repeal. This would obviously overburden the state courts and have a shattering affect on the administration of justice in New York.[13]

We, therefore, conclude that the rejection of 5/1000 of 1% of those called for jury duty did not violate petitioner's right to due process or equal protection, and that the system used for the selection of the grand and petit juries that indicted and convicted petitioner for the two robberies in question did not deliberately and systematically exclude Negroes, laborers, blue collar workers, members of the lower economic class or those owning less than $250 in property.

---

10. Sims v. Georgia, *supra*; Whitus v. Georgia, *supra*; Avery v. Georgia, *supra*.

11. N.Y. Judiciary Law § 596.

12. Fay v. New York, *supra*, 332 U.S. at 270, 67 S.Ct. 1613.

13. See Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

We turn, therefore, to petitioner's second claim.

Petitioner claims, as to the second conviction, that the courtroom identifications of him by Mrs. Ida Hartley and Mrs. Mary Sperling were based on impermissibly suggestive pre-trial identifications and, therefore, violated his right to due process.

 The new rules requiring counsel at pre-trial identifications only apply to confrontations for identification subsequent to June 12, 1967.[14] The pre-trial identifications in question occurred on June 26, 1963 and will only be set aside if "on the totality of the circumstances" the identifications are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."[15]

This determination requires a consideration and weighing of all the facts relevant to the identification procedure. Here, precedents merely provide guidelines, not general rules. Significant factors for consideration are: (1) the witness' opportunity to observe defendant at the commission of the crime, considering lighting conditions and duration of the observation;[16] (2) his ability to distinguish Negroes;[17] (3) his description of the defendant immediately after the crime; (4) his identification of the defendant by selection of his mug shot; (5) his opportunity to observe defendant at pre-trial identification; (6) his initial certainty of identification;[18] (7) the lapse of time between the commission of the crime and the witness' pre-trial identification;[19] (8) the language police use in presenting defendant for pre-trial identification; (9) the conspicuousness of defendant as a suspect, because he is alone, the only Negro, or is wearing certain clothes;[20] (10) attempts by police to convince the witness despite an uncertain identification;[21] and (11) the extent of defense counsel's cross-examination and summation on the issue of misidentification.[22]

 Here, the robbery at Mrs. Sperling's house was committed at mid-day. Mrs. Sperling testified that she observed petitioner when he entered her kitchen from the laundry and once again immediately before he pulled out a gun. Although she admitted that she had only a brief second to observe him, she insisted on cross-examination that she had a "very good look at him" and noticed that he had a cast in his eye, just like her son.

Mrs. Hartley testified that the robbery took about fifteen minutes, and, except for "a short time" she was forced to lay on the floor, she was able to observe the robber. When he first shoved the gun in her stomach, she looked right at

14. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); United States ex rel. Geralds v. Deegan, 292 F.Supp. 968, 970 (S.D.N.Y.1968).

15. Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); United States ex rel. Geralds v. Deegan, *supra*.

16. United States v. Baker (Masciola), 2d Cir., 419 F.2d 83, October 15, 1969; United States ex rel. Rutherford v. Deegan, 406 F.2d 217 (2d Cir.), cert. denied, 395 U.S. 983, 89 S.Ct. 2145, 23 L.Ed.2d 771 (1969).

17. United States ex rel. Rutherford v. Deegan, *supra*.

18. United States ex rel. Anderson v. Mancusi (2d Cir. 1969), 413 F.2d 1012.

19. United States ex rel. Anderson v. Mancusi, *supra*.

20. Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

21. Foster v. California, *supra*.

22. United States v. Baker (Masciola) *supra*; United States ex rel. Rutherford v. Deegan, *supra*.

him and noticed there was something wrong with his eye.[23]

Shortly after the crime, both ladies, independently, described the robber to the police. Mrs. Sperling said he was a fair-skinned Negro and was wearing dark glasses and a cap. Mrs. Hartley said he was a Negro, about five feet ten or eleven inches in height, 180 to 190 pounds, and was wearing dark glasses and a chauffeur-type cap.

Mrs. Hartley was able, the very day of the crime, to select petitioner's picture from mug shots shown to her by the police. In succeeding weeks, neither she nor Mrs. Sperling ever incorrectly identified another man as the robber, even though they were shown "hundreds" of mug shots for identification and Mrs. Hartley was taken to observe a lineup of five or six men.[24] Mrs. Hartley's selection of Geralds' picture and the fact that she was never confused by the hundreds of other pictures she was shown, coupled with her certainty at the lineup, evidence the strength of her observation of the robber at the time of the crime.

Mrs. Hartley is black, and Mrs. Sperling, although white, testified that Mrs. Hartley was her very good friend of ten years' duration. Neither lady would appear to have any difficulty in distinguishing one Negro from another, as do many whites who live segregated from all contact with blacks.[25]

Before the June 26, 1963 pre-trial confrontation for identification, the police merely asked both ladies to come to the police station to observe a man. There was no reference whatever to petitioner as a suspect. Nor was anything said about him which would in any way make him or his picture more conspicuous than the other men or hundreds of pictures shown to the victims.

The ladies were taken separately into a room with a one-way mirror, which allowed them to view Geralds in the adjoining room. Upon observing him, both ladies were positive that petitioner was the robber, even before the police displayed him in dark glasses and a cap. Mrs. Sperling testified that she was certain immediately, and after seeing him with a cap and glasses, was "dead sure." Mrs. Hartley also testified that she knew petitioner was the robber "the moment she looked at him," and that the cap and glasses, and the words he spoke, merely reinforced her original certainty.[26]

At trial, defense counsel vigorously and exhaustively cross-examined both ladies concerning their opportunities to observe the robber at the time of the crime, the mug shots presented to them, and the lineup for pre-trial confrontation for identification. The question of mistaken identification was squarely presented to the jury, and in returning a verdict of guilty the jury necessarily concluded that Geralds was, beyond a reasonable doubt, the man who robbed Mrs. Hartley and Mrs. Sperling.

Considering all of the circumstances relating to Mrs. Hartley's and Mrs. Sperling's identifications of Geralds, we find that the pre-trial confrontation for identification was not so unnecessarily suggestive as to raise a substantial likelihood of irreparable mistaken identification. Moreover, both the courtroom and pre-trial identifications were based on the two ladies' observations of petitioner at the time of the robbery, and not on suggestions of any kind from the police.

Accordingly, petitioner's applications for writs of habeas corpus are in all respects denied.

So ordered.

23. United States ex rel. Anderson v. Mancusi, *supra*.

24. United States ex rel. Rutherford v. Deegan, *supra*.

25. United States ex rel. Rutherford v. Deegan, *supra*, 406 F.2d at 220.

26. See Caruso v. United States, 406 F.2d 558 (2d Cir. 1969).