UNITED STATES of America ex rel. Percy RUTHERFORD, Petitioner-Appellant,

v.

John T. DEEGAN, Warden of Sing Sing Prison, Respondent-Appellee.

No. 164, Docket 32751.

United States Court of Appeals Second Circuit.

Argued Nov. 7, 1968.

Decided Jan. 14, 1969.

Matthew Muraskin, Mineola, N. Y. (James J. McDonough, Mineola, N. Y., on the brief), for petitioner-appellant.

Hillel Hoffman, Asst. Atty. Gen., New York City (Samuel A. Hirshowitz, First Asst. Atty. Gen., and Louis J. Lefkowitz, Atty. Gen., of the State of New York, New York City, on the brief), for respondent-appellee.

Before LUMBARD, Chief Judge, MEDINA and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge:

On this appeal from an order denying a habeas corpus collateral attack on a New York State judgment of conviction for robbery the only substantial question concerns the identification of appellant Rutherford as one of the robbers.

The robbery occurred on October 29, 1965, Rutherford was identified as the robber at a police station showup conducted on November 9, 1965, he was later indicted by a Grand Jury on January 25, 1966, and then convicted, after a trial by jury, on September 15, 1966. He was sentenced on November 1, 1966.

The new rules applicable to cases of in-court identifications preceded by pre-trial identifications in lineups or showups without notice to or the presence of counsel were adopted by the Supreme Court on June 12, 1967 in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18

L.Ed.2d 1178 (1967). In the companion case of Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) the Court held the new rules were not retroactive but that cases involving "confrontations for identification purposes conducted in the absence of counsel" prior to June 12, 1967 were to be governed by the application of the principles of due process of law, which is said to involve an inquiry as to whether or not the confrontation in a particular case "was so unnecessarily suggestive and conducive to irreparable mistaken identification," as to make it unlawful, depending upon "the totality of circumstances surrounding" the confrontation. 388 U.S. at p. 302, 87 S.Ct. at p. 1972. In another case decided at the next Term of Court, Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the *Stovall* rule was paraphrased by indicating that it was a flexible rule and that the identification procedure will be set aside only when "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at page 384, 88 S.Ct. at page 971.

The only violation of due process by identification confrontation cited in the opinion of the Court in *Stovall* was Palmer v. Peyton, 359 F.2d 199 (1966), a Fourth Circuit case, where the circumstances of the so-called confrontation were most outrageous.

Since the formulation of the new rules, as one would expect, this type of attack has become commonplace.[1] While essential fairness is the touchstone of due process, it is difficult to be sure that the guidelines as stated in *Stovall* and *Simmons* are being followed. We think it clear that the rule of *Wade*, applicable only prospectively and requiring a hearing and finding that "the in-court identifications had an independent source" based on "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification" or a finding that the error was harmless, is clearly not the rule governing *Stovall* or other due process of law cases. To intermingle the two separate but analogous rules of *Wade* and *Stovall* can only result in confusion, some of which is already apparent in the opinions of the Courts of Appeals that have already considered a number of these pre-*Wade* due process of law situations. Indeed, Judge Bazelon, dissenting in Wright v. United States, 404 F.2d 1256 (D.C.Cir.1968), seems to favor a sort of *per se* rule in connection with all lineups or showups in order to afford the prisoner due process of law, except in emergency cases such as *Stovall* where the victim was in a hospital in a precarious situation due to the wounds inflicted by the perpetrator of the crime. This is supposed to be what is meant by the *Stovall* formula-

---

1. See, e. g., United States v. Gilmore, 398 F.2d 679 (7th Cir. 1968); Cline v. United States, 395 F.2d 138 (8th Cir. 1968); Pearson v. United States, 389 F.2d 684 (5th Cir. 1968); Hanks v. United States, 388 F.2d 171 (10th Cir. 1968); Wright v. United States, 404 F.2d 1256 (D.C.Cir. 1968); Quarles v. United States, 387 F.2d 551 (4th Cir. 1967), cert. denied, 391 U.S. 922, 88 S.Ct. 1815, 20 L.Ed.2d 659 (1968); Wise v. United States, 127 U.S. App.D.C. 279, 383 F.2d 206 (1967), cert. denied, 390 U.S. 964, 88 S.Ct. 1069, 19 L. Ed.2d 1164 (1968); Crume v. Beto, 383 F.2d 36 (5th Cir. 1967); United States v. Ball, 381 F.2d 702 (6th Cir. 1967), cert. denied, 390 U.S. 962, 88 S.Ct. 1066, 19 L.Ed.2d 1161 (1968); United States v. Beard, 381 F.2d 325 (6th Cir. 1967); People v. Caruso, 68 Cal.2d 181, 65 Cal. Rptr. 336, 436 P.2d 336 (1968); People v. Feggans, 67 Cal.2d 444, 62 Cal.Rptr. 419, 432 P.2d 21 (1967); Commonwealth v. Bumpus, Mass., 238 N.E.2d 343 (1968), cert. denied, 393 U.S. 1034, 89 S. Ct. 651, 21 L.Ed.2d 579 (1969); Howard v. State, 4 Md.App. 74, 241 A.2d 192 (Ct.Spec.App.1968); McRae v. State, 3 Md.App. 388, 239 A.2d 607 (Ct.Spec. App.1968); People v. Hill, 22 N.Y.2d 686, 291 N.Y.S.2d 802, 238 N.E.2d 913 (1968); People v. Ahmed, 20 N.Y.2d 958, 286 N.Y.S.2d 850, 233 N.E.2d 854 (1967); People v. Ballott, 20 N.Y.2d 600, 286 N.Y.S.2d 1, 233 N.E.2d 103 (1967); People v. Brown, 20 N.Y.2d 238, 282 N. Y.S.2d 497, 229 N.E.2d 192 (1967).

tion. We do not not agree with this interpretation. We think it is clear that no *per se* rule governs the due process of law cases.

■ The inquiry in all these due process of law identification cases arising before *Wade* is simple, direct and unequivocal: was the lineup or showup, without notice to or the presence of counsel, "on the totality of circumstances surrounding" the confrontation "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"? We proceed to apply this test to the facts of the case before us. Since the critical identification confrontations occurred prior to Rutherford's trial on September 13th and 15th, 1966, there is no question of the applicability of the *Wade* and *Gilbert* rules which apply only to confrontations for identification purposes conducted after June 12, 1967, and only the *Stovall* rule applies. This is the first case to come before this Court squarely raising the *Stovall* issues.

Shortly after noon on October 29, 1965, Mrs. Marjorie Donnelly, a counter girl in a cleaning establishment in Long Beach, New York, was working in the back room of the store, which was on the street level. She heard the front door open and shut. Going up front she saw two Negroes standing by the counter. From their expression, she testified, she knew what they wanted. One man was very tall and thin and badly needed a shave; the other was shorter and smaller.

The description Mrs. Donnelly gave the police immediately after the occurrence, as testified by police detective Chalvien, who investigated the robbery, was:

Q. Would you now relate that description to us? A. Yes. One was male Negro, very tall, over 6 foot, very dark, very heavy beard in need of a shave, wearing a three-quarter coat, car coat, dark checkered, no hat on and very tall and thin.

No. 2 was male Negro, approximately 5–6, medium height, clean-cut, round light skin, wearing a dark-brown fedora and a light-like poppin [sic] topcoat, trenchcoat.

The shorter man pointed his pistol at Mrs. Donnelly, pushed "the business end" of the pistol into her side, and directed her to open the cash register, which she did. Then he directed his accomplice to take Mrs. Donnelly to the back of the store. As the accomplice was taking her there, he noticed her pocketbook and a small transistor radio, both resting on a shelf in the back room. He took money out of her purse and he also took the radio. The short man came back to see what was delaying his accompliace and they both took Mrs. Donnelly to the back and put her in the washroom there. The shorter man assured her "Don't worry we won't hurt you." A short time later, when Mrs. Donnelly heard a customer in the store, she pushed her way out of the washroom and called the police.

Mrs. Donnelly testified on direct examination at the trial to an in-court identification of Rutherford as the taller of the two robbers. The robbery occurred in broad daylight; neither of the two robbers used any disguise or concealed their faces in any way; the store was lit by fluorescent lights; and Mrs. Donnelly testified that she had watched the two men closely during the period of some five minutes when the smaller of the two men was rifling the cash register and the taller one was taking the money out of her purse, putting the transistor radio in his pocket, and getting her back to the washroom. At one point he even put a hand on her shoulder.

■ Mrs. Donnelly further testified that she made a deliberate attempt to study the face of the man who was rifling her pocketbook and taking the transistor radio in order to remember his face and build so that she could identify him later if she saw him again. She had attended an integrated high

school, worked in an integrated neighborhood, and had previously worked in a Negro neighborhood. She said some of her friends were Negroes and that she had no difficulty distinguishing one Negro from another. She also testified that she had 20-20 vision.

Only on cross-examination was the subject of the pretrial confrontation brought up. To follow the matter chronologically, the record discloses that immediately after her description was sent out over the police radio she went with Detective Chalvien to several bars and a bus station to see if she could identify either of the robbers among those at these public places. As this quest was unsuccessful, she was then taken to the police station and shown hundreds of photographs, still without success. On at least four occasions she was shown other suspects but in each case she said he was not the man.

Finally, in the evening of November 9, ten days after the robbery, Detective Chalvien told her that they had a "suspect" and would she come and look at him. She went to the station house and looking through a one way window from another room saw Rutherford and several detectives, all of whom were white. She immediately recognized Rutherford and said "That is the man." He was asked to stand and turn in various directions but the identification had been complete and instantaneous.

At the time of this single person showup he was not wearing the same clothes as he did on the day of the robbery, and he had shaved.

On a later occasion she went to look at another person whom the police thought might be the other robber, but she said he was not.

The description given to the police, as above stated tallied perfectly with Rutherford, except for the change of clothing and the shaving. He was in fact 6 feet 5½ inches in height and very thin.

Rutherford's counsel tried to establish the defense of mistaken identification.

A good part of the trial was devoted to cross-examination of Mrs. Donnelly concerning the circumstances of the showup and the likelihood or even possibility of a misidentification. To support his defense, Rutherford took the stand and testified that he had nothing to do with the robbery but on that morning was still in bed in his hotel room as it was his usual habit not to get up until around noon.

In view of this "totality of circumstances surrounding" the confrontation, we find nothing to justify a finding that there was any "likelihood of irreparable misidentification." There was no denial of due process.

 Probably because of the references in *Wade* to harmless error, appellant claims constitutional error arising out of the circumstance that the Court of Appeals of the State of New York in unanimously affirming Rutherford's conviction of first degree robbery, second degree grand larceny and assault, followed by a sentence on November 1, 1966 to a term of imprisonment from ten to twenty years, cited the New York harmless error statute but did not state in so many words that their finding of harmless error was "beyond a reasonable doubt." There was no error in the identification procedure in this case. Whether or not the Court of Appeals of the State of New York may possibly have thought there was some error is immaterial, as it is the function of the federal courts on a habeas corpus collateral attack to make their own investigation of the record and make their own findings. Nevertheless, we have read the briefs and the record before the Court of Appeals of the State of New York and think probably the reference was to a mere matter of the application of a state rule of evidence, as there was some mention on the cross-examination of Rutherford at the trial of his use of narcotics, and this was assigned as a reason for reversal.

Affirmed.