UNITED STATES of America ex rel. Larry Julius GIBBS, Appellant,

v.

Leon J. VINCENT, Superintendent, Green Haven Correctional Facility, Appellee.

No. 131, Docket 75–2057.

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1975.

Decided Oct. 29, 1975.

---

[1.] *Henderson v. ILWU, Local 50,* 457 F.2d 572, 578 (9th Cir. 1972); *see also Vaca v. Sipes,* 386 U.S. 171, 182, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

Michael A. Young, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, on the brief), for appellant.

Rhonda Amkraut Bayer, Deputy Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, on the brief), for appellee.

Before MEDINA, ANDERSON and VAN GRAAFEILAND, Circuit Judges.

MEDINA, Circuit Judge:

This is an appeal from an order of Judge Bartels in the Eastern District of New York denying a habeas corpus application for a new trial because the New York courts that sustained the conviction of Gibbs for robbery in the first degree are claimed to have violated the constitutional rights of Gibbs by receiving in evidence against him the testimony of witnesses based upon an alleged tainted identification procedure. The opinion below is not reported.

The prosecution chose to rely on in-court identification by three witnesses who were in the store at the time of the robbery. While no objection was made at the trial to the admission of the testimony of these witnesses, the due process question was properly raised by a pretrial motion "for a suppression of the identifications made of the defendant" followed by a suppression hearing in the New York State court on January 29, 1968. The presiding judge said he believed the testimony of Detective Adelson who made the arrest of Gibbs and supervised the challenged show-up, and the motion to suppress was denied. The following brief description of the course of events prior to the suppression hearing and at the trial will serve as a background against which we shall later give our reasons for holding that none of Gibbs' constitutional rights to due process of law were infringed.

■ On March 8, 1967, a large cleaning establishment known as the Nuclear Drive-In Cleaner on Linden Boulevard in the Saint Albans section of Queens County, New York, was entered at 6:45 P.M. by two blacks who held up the occupants of the store and escaped with five or six hundred dollars in cash. This was prior to June 12, 1967, when the Supreme Court adopted new rules applicable to cases of in-court identifications in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). As the new rules were not made retroactive, this case is governed by the prior rules which in substance required an inquiry into the facts of each case to determine whether the defendant had been deprived of due process of law by the identification procedure followed by the police and by the prosecution. We had occasion to discuss the application of both the new and old rules in *United States ex rel. Rutherford v. Deegan,* 406 F.2d 217 (2d Cir. 1969). The test we must apply in this case is clearly stated in *Deegan* to be: Was the line-up or show-up without notice to or the presence of counsel on "the totality of circumstances surrounding" a confrontation "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." This is the only substantial question before us in this case.

*I*

■ Three people were in the cleaning establishment when the two black robbers came in. Sam Bleck the proprietor was packing some shirts in a box on the counter several feet from the cash register. Margaret Perry, an employee, was standing a few feet away tagging clothes. Another employee, David Alston, was in a room, "a big vault" with a "big door," adjacent to the counter where Bleck was working. The testimony is that the stick-up took about a minute, but a lot can happen in a minute as can be attested by anyone keeping track of the time just before the starting gun of a yacht race or watching the closing minute of a football game. The impact on eyewitnesses of an armed robbery depends on what each of the witnesses saw and heard. These are the details that make up "the totality of circumstances"

surrounding the challenged identification.

When the robbers came into the store one of them knocked on the counter for attention and asked for change of a ten dollar bill. Bleck said: "I'm sorry, I don't have too many singles, maybe in the drawer." At that one of the robbers, later identified as Gibbs, pulled a gun and said: "This is a stick-up and I want all the money." Bleck replied: "You will get all the money, I don't want anyone to get hurt. You tell me what I should do and I'll do it. I'll take the money out of the register." The robbers proceeded to take the money out of the drawers of the cash register, Bleck having removed the two drawers and placed them on the counter, but in doing so a roll of quarters broke and the quarters spilled over the counter and on to the floor. The robbers scooped up the money and put it in their pockets. Before this, however, Bleck was afraid that Alston would "come out of the vault any second and as he will open the door I was afraid they may start shooting at him." So, Bleck testified to the following conversation between him and Gibbs:

Bleck: I have a man in the vault cleaning up my place, cleaning up the vault. He may come out any second. He works here. Don't harm him.

Gibbs: Okay. Let's have the money, let's have the money.

At the request of the robbers, Bleck took out of his pockets all the money he had, about $120.00, and gave it to the robbers. The robbers also found time to take an additional $54.00 from the petty cash drawer that was half hidden under the counter below the cash register.

While this was going on the store telephone rang and Mrs. Perry answered it. It was her daughter so she said she would call back and hung up. Each of the robbers had a gun in his hand and these guns were pointed at Bleck. As the money was being handed over to the robbers, David Alston came out of the vault. So the entire incident occurred in the full view of Bleck. Mrs. Perry had a good view of the robbers but was not involved to the same extent as Bleck. And David Alston saw the tag end of the robbery with a good view of the robbers as they left the store.

As the robbers went out after the stick-up, a customer was coming in. Mrs. Perry recognized the customer as a Correction Officer whom she knew and she cried out, "Those two fellows just held us up." As the robbers ran up the street the Correction Officer pulled out his pistol, ran after them and fired two shots, but they got away.

Neither of the robbers wore a mask nor were their faces obscured in any way. Nor is it claimed that the lighting fixtures in this large cleaning establishment gave insufficient light. Moreover, there were many blacks in the neighborhood and many of the customers of the store were blacks. So the three witnesses were accustomed to dealing with negroes.

The police were summoned at once and in less than 10 minutes after the stick-up Detective Adelson was in the store with a book containing a number of photographs of white men and about 40 or 50 photographs of black men. Bleck immediately and without any hesitation selected a photograph of Gibbs as one of the robbers.

On this same evening, about three quarters of an hour after the stick-up, Detective Adelson took Bleck, Mrs. Perry and Alston to the police station where he produced another book with several hundred photographs, including a photograph of Gibbs that was different from the one in the book shown to the witnesses at the store. One photograph was a "resident file card" and the other was "a complete photograph" (Transcript, p. 54). Again Bleck unhesitatingly selected the photograph of Gibbs and said he was one of the robbers.

Some 6 days later, on March 14, 1967, Gibbs was arrested at about 11 P.M. and immediately taken to the police station, where he was put in a room where he could be observed by others looking at him from an adjoining room through a

one-way glass. Bleck, Mrs. Perry and Alston were brought into this room. They had been summoned to "identify somebody." Gibbs was there facing the window through which Bleck, Mrs. Perry and Alston looked. There were also two blacks, the mother and father of Gibbs, a white police officer, and perhaps one of Gibbs' sisters. Bleck, Mrs. Perry and Alston all identified Gibbs as one of the robbers. It is evident from the testimony at the suppression hearing and the testimony at the trial that the purpose of the show-up was merely to confirm by a view of Gibbs personally the previous identifications made by Bleck, Mrs. Perry and Alston from the photographs shown to them first at the scene of the robbery and then at the police station on the day of the robbery. This show-up was in no sense a line-up. It was suggestive but did not serve the purpose of a line-up.

At the trial Bleck, Mrs. Perry and Alston testified that Gibbs was one of the robbers.

## II

The testimony given by Bleck at the suppression hearing and at the trial was amply sufficient to establish compliance with the rule formulated in *Deegan*. He described exactly what went on at the time of the robbery and what he and Mrs. Perry and Alston saw and heard. As the prosecution relied at the trial solely upon the in-court identifications, there was no repetition at the trial of the testimony of Bleck at the suppression hearing about the identifications from the photographs at the store ten minutes after the holdup and a short time later from other photographs at the police station.

■ There was no necessity for the prosecution to produce Mrs. Perry and Alston at the suppression hearing in the absence of some request or suggestion by defense counsel that he wished to have them produced. The descriptions of the entire identification procedure by Bleck and by Detective Adelson at the suppression hearing were complete and covered what Bleck, Mrs. Perry and Alston saw at the time of the holdup, the identifications shortly after the holdup from the photographs shown by Detective Adelson to the eyewitnesses at the store and at the station house, and what occurred at the show-up later on March 14. Some of the testimony is explicit; but we think it is fairly to be inferred from the record as a whole that each of the three in-court identification witnesses, Bleck, Mrs. Perry and Alston, recognized Gibbs by one of the photographs shown to them at the store by Detective Adelson shortly after the holdup, that each of them again identified Gibbs from a different photograph shown to them at the police station about a half hour later and that each of them identified Gibbs again at the show-up. However, such proof in its entirety was not necessary as the prosecution relied at the trial solely on the in-court identification by the three eyewitnesses to the robbery.

Our conclusion that the prosecution had no duty to produce Mrs. Perry and Alston at the suppression hearing is not based on any waiver by Gibbs of a right to have these witnesses produced. Gibbs had no such right to the production of any particular witness. We conclude that these witnesses were not produced and that Gibbs made no request for their production because the testimony of Bleck described the entire identification procedure and testimony by Mrs. Perry and Alston would have been cumulative and merely corroborative of the description given by Bleck.

## III

■ The legal effect of the show-up is not to be determined by any right or wrong, black or white test but by taking all the circumstances of the identification procedure into consideration and then arriving at a reasoned conclusion of whether the show-up was of such a character as to establish "a very substantial likelihood of irreparable misidentification."

The opportunity for observation at the time of the commission of the crime in a

given case may have been so limited or so doubtful as to make it appear that the impression made at a suggestive show-up or line-up would be very likely to blot out or supersede the impressions made on the witnesses at the time of the commission of the crime. Consideration must be given to all the attendant circumstances. Here the holdup was in the full view of three persons. The testimony of Bleck covers every detail. The identification of Gibbs at the trial by each of the three witnesses is positive and it was made without hesitation or the indication of any doubt. We perceive no basis in the record before us to warrant a finding that the impressions made on the witnesses at the time of the robbery were displaced or superseded or in any way affected by the show-up a week later.

It was only natural for the police to produce Gibbs immediately after his arrest and give the identifying witnesses an opportunity to see him in person. There was no line-up, nor was there any occasion for a line-up. As remarked by the New York Supreme Court justice who presided over the suppression hearing, the police might just as well have stationed the witnesses at a place of observation and had Gibbs walk by on the street with a member of the force. Moreover, the identification from the photographs was entirely proper before and after the establishment of the new rules by the Supreme Court on June 12, 1967. See *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

*IV*

█ Much is made of the fact that the appellant, Larry Gibbs, had a twin brother named Garry. It was conceded by counsel that they were not identical, but were rather fraternal twins, bearing some resemblance to one another. The police did not know of the existence of Garry until the night the appellant was arrested. We find no merit in the contention that the failure to bring Garry to the police station with his mother and father and place him beside Larry at the time of the show-up was in some way an infringement of appellant's right to due process of law.

█ We are also asked to find some infringement of the appellant's constitutional rights in the refusal of the trial judge in the state trial to permit Garry, Larry and the husband of one of their sisters, Leonard Johnson, who is claimed closely to resemble Larry, sit side by side at the counsel table during the trial. Counsel had caused Garry and Larry to be dressed precisely alike. We can understand why this was not allowed but, in any event, the ruling was made in the exercise of the discretion of the presiding judge to control the trial and no error of New York law was found by the state courts when the conviction of appellant was affirmed by the Appellate Division and leave to appeal to the Court of Appeals was denied. A somewhat similar request was made that Garry be permitted to sit at the counsel table during the suppression hearing. This was denied on the ground that this pre-trial hearing was not for the purpose of determining the question of identification but rather to determine whether the identification procedure followed by the prosecution deprived Gibbs of his constitutional right to due process. We think this ruling was correct.

When Mrs. Perry was on the witness stand, and in the full view of the jury, both Garry and Leonard Johnson, who later testified as an alibi witness for the defense, were produced. Mrs. Perry looked them over and then said: "They all look different." She again insisted that Larry Gibbs was one of the robbers.

Appellant's brief is replete with a miscellany of recitals of numerous parts of the testimony of the various witnesses which seem to us to require no discussion as they represent details that must be deemed to have been taken into consideration by the jurors when they decided the question of appellant's guilt or innocence. These include: a number of what we consider to be minor discrepancies in the description of the weight, height and

age of the robbers; the fact that the police made no effort to recover fingerprints, although there was testimony that neither of the robbers wore gloves; the fact that at the time of the arrest there was no search of the private house where appellant lived to find a weapon or some part of the money that had been stolen; the fact that Bleck was not, at the time of the holdup, wearing his distance glasses as required by his driver's license, and so on.

Judgment affirmed.