Dallas SIMON, Petitioner,

v.

Robert H. KUHLMAN, Superintendent,
Woodbourne Correctional Facility,
Respondent.

No. 78 Civ. 3781 (WCC).

United States District Court,
S. D. New York.

Nov. 7, 1979.

Dallas Simon, pro se.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for respondent.

Melvin Bressler, Asst. Dist. Atty., Rochester, N. Y., of counsel, for proposed intervenor Lawrence T. Kurlander.

## OPINION AND ORDER

CONNER, District Judge:

This is a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254.

Petitioner is presently confined at Woodbourne Correctional Facility pursuant to a judgment of conviction rendered on August 9, 1974 in the Monroe County Court convicting him, following a jury trial, of attempted first-degree robbery, possession of weapons and reckless endangerment in the first degree. Petitioner's conviction was affirmed without opinion by the Fourth Department on October 24, 1975, and leave to appeal to the New York Court of Appeals was denied on December 11, 1975. Petitioner subsequently moved, pursuant to New York Criminal Practice Law § 440.10, to vacate the judgment of conviction or for a new trial. The trial court denied petitioner's motion without conducting a hearing and leave to appeal to the Appellate Division was denied on May 11, 1977.

In the instant application, petitioner claims (1) that his conviction was obtained as a result of improper identification procedures; and (2) that the jurors at petitioner's state-court trial improperly considered evidence outside the record. As the claims turn on the facts, this Court must first review the relevant testimony at the jury trial and at the Wade[1] hearing held to determine the constitutionality of the identification procedure.

*The State's Case*

A. The Victim's Testimony

Mrs. Eve Clements, the proprietor of "Eve's Birdland," a restaurant located at 368 Hudson Avenue in Rochester, New York, testified that shortly after midnight

1. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

on the morning of December 28, 1973, she was standing behind the counter in her restaurant, near to the cash register, when a man, whom she identified at trial as petitioner, came into the restaurant, walked up to where she was standing, pointed a gun at her stomach, and demanded money from her. At the time of the attempted robbery, two customers were seated at the counter directly in front of Mrs. Clements: Miss Sheila Strother, a part-time employee at Eve's Birdland who was not working at the restaurant on that evening; and Mr. James Thompson. Mrs. Clements told the robber that her money was in a money bag in a back room of the restaurant. Just as the robber was making his way to the back room to get the money bag, a police officer entered the restaurant. The robber came out of the back room, walked past the police officer and out of the restaurant and the police officer followed him.

Mrs. Clements testified that the lights in the restaurant were on at the time of the attempted robbery; that, in total, the robber was in the restaurant for one and a half to two minutes; that for much of that time he was only three feet from her and faced her directly; and that he wore a long tan overcoat and a very sheer stocking over his face, through which she was able to see that he had a moustache, a beard and that his hair was in braids. Mrs. Clements testified that she recognized the robber as someone whom she had seen in her restaurant on a prior occasion. When asked whether she had any question in her mind that petitioner was the man who attempted to rob her on the night in question, Mrs. Clements said: "No, sir, there is no question about it."

On cross-examination, Mrs. Clements testified that after the attempted robbery, she went down to police headquarters where a police officer asked her to look at several photographs of black men and thereafter, she was asked to identify a man who was being held in a room at the station-house. On redirect examination, she testified that she immediately selected petitioner's photograph from the four or five photographs that she was shown and that when she was

asked to identify a man seated alone in a room at the police station, she was immediately able to identify him as the man who had attempted to rob her earlier that morning.

### B. Miss Strother's Testimony

Miss Strother testified that the robber was in the restaurant for approximately fifteen minutes; that he wore a brown coat, dark, baggy pants, and a sheer brown stocking over his face, which did not obstruct her view of his facial characteristics, including his moustache, long sideburns, and braided hair. At trial, she identified a coat which had been recovered by the police near the location of the restaurant as the coat worn by the robber on the night in question; she also identified petitioner as the man who attempted to rob Mrs. Clements.

### C. Officer Perry's Testimony

Officer Robert Lee Perry testified that he entered Eve's Birdland shortly after midnight on December 28 to use the telephone and that as he approached the counter a man wearing a very sheer stocking cap and holding a gun in his pocket passed by him. Officer Perry testified that he and the robber were face to face for fifteen to twenty seconds and that Officer Perry recognized the robber as an individual whom he had seen on eight or nine previous occasions, the most recent being two weeks prior to that morning. The robber had a moustache and long sideburns and he was wearing a black hat, blue jeans, and a brown knee-length overcoat.

Officer Perry pursued the robber for about ten minutes, during which time the police officer and the robber exchanged gun shots. Officer Perry testified that from the time the robber left Eve's Birdland to the time he was captured in a house on Putnam Street, the robber was always in the police officer's view with the exception of two occasions. On the first occasion, Officer Perry lost sight of the man when he climbed over a fence near Cleveland Street, but the police officer ran around to where

he thought the man might reappear and observed him removing the brown overcoat. The stocking cap and the black hat which Officer Perry had seen the man wearing earlier were gone, however. The man then ran into the backyards between Hudson Avenue and Putnam Street and Officer Perry got into his vehicle and drove around the corner to Putnam Street. When he left his car and walked down Putnam Street, Officer Perry saw the man walking toward the rear of 4 Putnam Street. By that time, several additional police officers had arrived and together with Officer Perry they entered the house and found petitioner fully clothed and under the covers in a bed in the house. The police officers found forty-five dollars which belonged to petitioner in that bedroom.

Another police officer, Officer Brighton, testified that he found a gun and a brown coat during a search of the area surrounding Eve's Birdland and 4 Putnam Street.

*The Defense*

At trial, petitioner testified in his own behalf. He denied being in Eve's Birdland on the night in question. He testified that he had been gambling that evening, and that he had become involved in a dispute with one of the other players when a gun went off. Fearing that he had killed the man he was fighting with, petitioner fled the gambling club. Petitioner was passing near Eve's Birdland when he saw a police officer running down the block and, thinking that the officer was seeking him because of the incident at the gambling club, petitioner began to run from the officer. Petitioner denied climbing over a fence near Cleveland Street; he testified that he ran directly to the house on Putnam Street, the home of a distant relative, to seek refuge from the police.

Charles Carelock, an acquaintance of petitioner's, testified that he was on his way to Eve's Birdland to try and sell Mrs. Clements some stolen merchandise when he saw petitioner, with whom he exchanged greetings. Shortly thereafter, Carelock saw another man come out of Eve's Birdland with a police officer in pursuit. Carelock began

to walk away, and when he turned back and looked down the street to where he had earlier seen the man and the police officer, he saw that the police officer was now chasing petitioner.

*The Wade Hearing*

Two individuals testified at the *Wade* hearing held to determine the constitutionality of the station-house identifications: Mrs. Clements and Mr. William Gibson, a customer of Mrs. Clements' who had been about to enter Eve's Birdland on the morning in question when he saw a man and a police officer running out of the restaurant. Mr. Gibson did not testify at trial and his testimony at the *Wade* hearing is not at issue in this application for habeas relief.

At the *Wade* hearing, Mrs. Clements testified about the events of that morning, giving much the same description of the attempted robbery as she gave at trial. With respect to her identification of petitioner as the man who attempted to rob her, she testified that she arrived at police headquarters at about 2:00 A.M. on the morning of December 28; that a police officer asked her whether she would be able to identify the robber to which she responded, "Certainly"; that the police officer then gave her about five photographs of black men and Mrs. Clements picked out a photograph of the petitioner and said, "This is him right here"; that she was then taken to a room in the same building and a police officer asked her to look through a window in that room which allowed her to see into an adjoining room where a man was asleep with his head on a table; that another police officer went into the room and woke up the sleeping man so that she could see his face; that when the man stood up, Mrs. Clements stated: "Oh, that's it. That is definitely the same man." Just prior to viewing petitioner through the window, Mrs. Clements had been told by a police officer that "We have a man [,] we picked up a man and do you think you could identify the man that robbed you?"

*Discussion*

A. The In-Court Identification

An improperly conducted identification procedure may constitute a violation of

a defendant's due process rights under the Fifth and Fourteenth Amendments.

"[T]he two-step process suggested in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1973), [for determining whether a constitutional violation exists] . . . requires a determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise 'a very substantial likelihood of irreparable misidentification.' *Id.* at 198, 93 S.Ct. at 381, citing *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), see *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)." *Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir. 1978).

Petitioner contends, respondent does not dispute, and the Court agrees, that the procedure utilized by the police in this case—of placing petitioner in a room and having the complainant view him through a one-way window from an adjoining room—was suggestive. See generally *Neil v. Biggers, supra* ; *Jackson v. Fogg, supra; United States v. Watson*, 587 F.2d 365 (7th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979); *United States v. Vincent*, 524 F.2d 634 (2d Cir. 1975); *United States ex rel. Phipps v. Follette*, 428 F.2d 912 (2d Cir.), *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970). The Court concludes, however, that under the totality of circumstances this impropriety did not lead to a substantial likelihood of misidentification.

The factors to be considered in determining whether Mrs. Clements' identification of petitioner at trial was reliable are set out in *Neil v. Biggers, supra*, 409 U.S. at 199–200, 93 S.Ct. 375: (1) The opportunity of the witness to view the criminal at the time of the crime. Mrs. Clements testified that she had no trouble seeing petitioner's face through the very sheer mask; that she had the gunman in her view in a well-lit room for one and a half to two minutes; and that much of the time Mrs. Clements and the gunman were face to face. A lasting impression can be formed after observing an individual for two minutes under such conditions. See generally *United States v. Vincent, supra*, 524 F.2d at 636 (identification of unmasked robbers during a robbery that took about one minute upheld). (2) The witness' degree of attention. Mrs. Clements testified at the *Wade* hearing that although she was very frightened during the attempted robbery, she concentrated on trying to remember the gunman's facial characteristics so that she could identify him if she were later asked to do so. Courts have commented that a victim of a crime, who has an interest in providing the police with detailed information so as to assist them in apprehending the criminal, is more motivated to make a careful observation of a perpetrator than a casual bystander. See *United States ex rel. Phipps v. Follette supra*. (3) The accuracy of her prior description of the criminal. The record is unclear as to whether Mrs. Clements gave the police a description of petitioner prior to the time she saw him at the stationhouse. However, the accuracy of her prior recollection of petitioner is demonstrated by the fact that she was able to pick out a photograph of petitioner immediately from among a display of five photographs of black men and by her testimony that she recognized petitioner when she saw him at Eve's Birdland on December 28, 1973, indicating that she already had an image of him in her mind when she saw him that night. (4) The level of certainty demonstrated at the confrontation. On all four of the occasions on which Mrs. Clements was asked to identify petitioner, at the time of the photographic array, the show-up, the *Wade* hearing, and at trial, Mrs. Clements identified him without hesitation; she also testified that she had no doubt that petitioner was the man who attempted to rob her on December 28. (5) The time between the crime and the confrontation. Only approximately two hours passed between the attempted robbery and the station-house identification. When weighed against these factors, the possible corrupting effect of the suggestive identification itself is not

substantial. The Court concludes [2] that petitioner has not shown that under the circumstances of this case, the confrontation between Mrs. Clements and petitioner at the station-house violated petitioner's constitutional rights, and thus the claim cannot support petitioner's petition for habeas corpus relief.

### B. The Jury Experiment

Petitioner alleges that during the jury's deliberations the question arose as to whether it was possible to identify an individual whose face was covered by a stocking and that the question was resolved in the affirmative when one juror put a stocking over his face and the other members of the jury found that they were able to recognize their fellow juror notwithstanding the stocking. Petitioner contends that the experiment was improper; that it introduced evidence outside of the trial record into the jury's deliberations; and that the experiment was especially prejudicial in view of the trial judge's ruling that petitioner would not be allowed to put a stocking over his face during the trial for the purpose of demonstrating to the jury that such a mask would render it impossible to identify petitioner. In light of these contentions, petitioner maintains that the jury experiment constituted a violation of his constitutional rights sufficient to warrant federal habeas relief.

### 1. Exhaustion of State Remedies

■ Petitioner submitted to the state trial court an affidavit from a juror attesting to the occurrence of the experiment, together with a motion for a new trial or in the alternative for a hearing, on the ground that the jury experiment violated petitioner's rights under the New York State and United States Constitutions. Petitioner's motion was denied without a hearing and leave to appeal to the Appellate Division was denied. Respondent does not argue that petitioner failed to exhaust his state remedies prior to filing his petition for habeas relief and this Court finds that petitioner's post-conviction motion, which raised only one issue, whether the jury experiment required that he be granted a new trial, presented the state courts with a fair opportunity to consider whether petitioner was denied due process of law. See *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

### 2. Nature of Petitioner's Claim

■ Petitioner alleges that the trial court barred him from demonstrating to the jury that a stocking could prevent the identification of the individual wearing it on the ground that it would be inappropriate to use a stocking whose texture and thickness might differ from the stocking worn by the robber during the attempted robbery. Nevertheless, during their deliberations the jury experimented with a stocking, the qualities of which were not revealed to the parties or to the court. Such an experiment by the jury would be improper and would constitute error. "Cases abound which hold that unauthorized experiments and consideration of matters not in evidence by a jury are improper." *United States v. Welch*, 377 F.Supp. 367, 368 (D.S.C.1973), *aff'd per curiam*, 496 F.2d 861 (4th Cir.), *cert. denied*, 419 U.S. 857, 95 S.Ct. 104, 42 L.Ed.2d 90 (1974).

■ However, unless an error is of constitutional magnitude, it does not present a cognizable claim for federal habeas relief. In resolving the question of whether a jury experiment can constitute a violation of a petitioner's constitutional rights, it will be helpful to review a line of decisions beginning with the Supreme Court's decision in *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct.

---

**2.** Respondent contends that the state trial court found that Mrs. Clements' in-court identification of petitioner would be based not on the show-up but on her previous observations of the petitioner, and that the state trial court's finding is supported by the credible evidence. Petitioner contends that the state trial court made no such findings and a review of the transcript of the *Wade* hearing substantiates petitioner's claim. The state trial court made no detailed findings either as to suggestiveness or as to reliability and this Court has made its own assessment of the undisputed facts. See *Jackson v. Fogg, supra.*

468, 17 L.Ed.2d 420 (1966) which discuss the possibility of a constitutional violation where jurors receive factual information outside of the record made in court.

In *Parker*, the Supreme Court held that statements to the jurors by a bailiff, who was assigned to shepherd the sequestered jury at petitioner's state criminal trial, that petitioner was guilty and that any errors made by the jury would be corrected by the Supreme Court, violated defendant's Sixth Amendment right to be confronted with the witnesses against him.

A. Due Process Claim

Judge Friendly's opinion for the Second Circuit in *United States ex rel. Owen v. McMann*, 435 F.2d 813 (2d Cir. 1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971), expanded the rationale of *Parker* to situations where the extra-record facts were introduced into the jury room by *jurors*, rather than third persons, who informed their fellow jurors of defendant's prior and unrelated confrontations with the law. Judge Friendly held that since the extra-record facts came to the jury's attention by way of a juror, the confrontation clause of the Sixth Amendment, which was the basis for the Supreme Court's decision in *Parker*, was not implicated. Rather, the question to be determined was whether the extra-record facts *created such a probability of prejudice that petitioner was denied due process.*

"The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a 'witness' and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice." 435 F.2d at 818.

Noting that there was no "litmus paper test" for determining whether the infiltration of a particular extra-record fact gave rise to such a probability of prejudice that the jury verdict would be deemed inherently lacking in due process, Judge Friendly noted that "a good definition has recently been drawn by Judge Goldberg in *United States v. McKinney*, 429 F.2d 1019, 1022–1023 (5th Cir. 1970) [(court ordered remand for a hearing), *rehearing granted and district court judgment affirmed*, 434 F.2d 831 (5th Cir. 1970) (Goldberg, J., dissenting), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971)].

"All must recognize, of course, that a complete sanitizing of the jury room is impossible. . . . Nevertheless, while the jury may leaven its deliberations with its wisdom and experience, in doing so it must not bring extra *facts* into the jury room. In every criminal case we must endeavor to see that jurors do not [consider] in the confines of the jury room * * * specific facts about the specific defendant then on trial. * * * To the greatest extent possible all factual [material] must pass through the judicial sieve, where the fundamental guarantees of procedural law protect the rights of those accused of crime." 435 F.2d at 818. (footnote omitted).

Most recently in *Bulger v. McClay*, 575 F.2d 407 (2d Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978), the Second Circuit found petitioner's constitutional rights had been violated when factual information outside the record, and potentially devastating to petitioner's defense, had come to the jury's attention. Bulger was convicted of burglary, primarily upon the testimony of a woman who witnessed the burglary of a store from her apartment window. The woman's description of Bulger's participation in the burglary at trial conflicted with the description she gave at a preliminary hearing and this was brought out on cross-examination. Petitioner's defense was that he was arrested while he was waiting for a bus, on his way to work. Bulger's home address was never a part of the record, but from a newspaper article the jurors learned his address, which was quite a distance from the bus stop and thus made his defense implausible. This information caused at least one juror to change his vote to guilty. Judge Weinstein held an evidentiary hearing, and on the basis of the

juror's testimony, concluded that a writ of habeas corpus should issue unless the state court granted petitioner a post-verdict hearing. When the state court failed to conduct a hearing, the writ issued and upon the State's appeal, the Second Circuit affirmed. Chief Judge Kaufman, in his opinion for the court, commented that:

"The jury, of course, is not a sterile institution in our judicial structure. It would be naive to suggest that individual jurors leave all their preconceptions, values and insights on the doorstep when they enter the jury room. Indeed, we encourage jurors to bring their experiences to bear during deliberation. The line between this permissible activity and the consideration of improper evidence is seldom clear. Yet, when specific facts enter the crucible of decision without appropriate safeguards, the constitutional role of the jury is undermined, and the defendant is denied the fair trial which is his constitutional due." 575 F.2d at 412.

The extra-record facts that infiltrated the jury room in *Owen* and *Bulger* differ from the alleged extra-judicial fact in the matter *sub judice* in that the information that infiltrated the jury room in *Owen* and *Bulger* would not have been available to the jury *at all* but for the improper actions of the jurors. In the instant matter, the fact that the robber wore a stocking was in evidence, as was the testimony of the eye-witnesses that the stocking was sheer. However, no stocking had been admitted into evidence and a request to conduct a demonstration using another—possibly different—stocking had been denied by the trial judge.

The question to be resolved by this Court, then, is whether the jury's unauthorized experiment might have created a possibility of prejudice sufficient to constitute a denial of due process.

Although this Court has found no Second Circuit decisions which discuss whether such an improper experiment by jurors can rise to the level of a due process claim,[3] courts in other Circuits have grappled with this problem. In *Durr v. Cook*, 589 F.2d 891 (5th Cir. 1979), a petitioner for federal habeas relief alleged that the jurors in his state criminal trial had improperly participated in an out-of-court experiment in order to test petitioner's allegation that he killed the victim in self-defense. Petitioner had testified at his state criminal trial that as he approached the victim, who was seated in a 1973 Ford pick-up truck, the victim simultaneously reached for a rifle from the back of the cab and began opening the truck door. The jury foreman, in what petitioner alleged was an apparent attempt to recreate the events of that day, was observed at a Ford dealership making certain twisting movements in a Ford pick-up truck. The foreman allegedly reported on the results of his experiment to the other jurors. The Fifth Circuit held that petitioner had a substantial claim that his constitutional rights were violated and remanded the matter to the district court for inquiry into the sufficiency of evidence to substantiate petitioner's claim and for a finding as to the existence of prejudice.

In *Gafford v. Warden*, 434 F.2d 318 (10th Cir. 1970), petitioner alleged that a juror went outside the evidence introduced at trial by verifying the time when a late show ended and going to a gas station to ascertain whether it was open at the time mentioned in the testimony. No hearing had been held in the state courts or by the federal district court and the Tenth Circuit remanded the matter to the federal district court with instructions that an evidentiary hearing be conducted since "[t]aken at face value, the [juror's] affidavit shows at the very least the possibility that the jurors

---

**3.** In *United States ex rel. DeLucia v. McMann*, 373 F.2d 759 (2d Cir. 1967), a petitioner for a writ of habeas corpus alleged that his conviction was based on the jury's unauthorized clandestine view of the premises of the alleged crime. The Second Circuit did not discuss the merits of petitioner's claim. Instead, the court ordered that the petition be dismissed without prejudice to renewal after petitioner had again raised his claim with the New York courts, which had originally considered petitioner's claim prior to the time the Supreme Court issued its decision in *Parker*.

considered facts which did not emanate from the witness stand." *Id.* at 320–21.

In *Miller v. Harvey*, 566 F.2d 879 (4th Cir. 1977), *cert. denied*, 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978), the victim of an assault testified that during the attack, she bit her assailant on the arm. At trial, the prosecution introduced into evidence photographs taken of petitioner when he was arrested which showed that he had a bruise on his arm and the testimony of an expert who stated that the bruise on petitioner's arm had been made by human teeth and not, as petitioner alleged, by the rough edge of a chain link fence. Petitioner alleged that during deliberations a female juror bit another juror on the arm to see the bruises that would result and that the jurors observed the bite mark for several hours before they returned their verdict. The district court held no evidentiary hearing, assumed that an improper experiment had taken place as alleged, and held that in view of the other circumstantial evidence, the error was beyond a reasonable doubt not prejudicial to petitioner. The Fourth Circuit affirmed, stating that in light of the expert testimony and petitioner's failure to offer any evidence to corroborate his explanation of the bruises on his arm, the court could not say that the experiment introduced into the jury's deliberations new matter so prejudicial as to deny petitioner due process of law. Judge Winter argued in a dissenting opinion that petitioner had alleged sufficient facts to warrant an evidentiary hearing.

**B. Hearing**

 This Court concludes that the foregoing decisions indicate that, as a matter of law, an improper jury experiment can constitute a denial of due process which in turn could justify a writ of habeas corpus, and that an evidentiary hearing should be conducted by this Court in this case to ascertain the nature and extent of the experiment that was allegedly conducted so that a determination can be made of whether the alleged experiment created any possibility of prejudice and thus could have amounted to a constitutional violation.[4]

Both the federal habeas decisions discussed above and a review of the decisions of several state and federal courts on motions by defendants for a new trial on the ground that an improper jury experiment tainted the jury verdict indicate that the factual issues surrounding a claim of improper jury activity should be resolved by an evidentiary hearing. Those decisions illustrate that a more accurate assessment of the possible prejudicial effect of a jury experiment results when a court conducts an evidentiary hearing rather than speculating first as to the facts surrounding an experiment and second as to the prejudice that such an experiment may have created. *Compare United States v. Welch, supra* (Evidentiary hearing conducted by district court to determine whether improper use of adhesive tape in jury room to simulate defendant's disguise required a new trial. Considering the nature of the experiment and evidence against defendant, error was harmless), and *McLane v. State*, 379 S.W.2d 339 (Tex.Cr.App.1964) (Trial court conducted a hearing to determine prejudicial effect of an experiment by the jurors with a silk

---

4. Respondent does not allege that the error was harmless beyond a reasonable doubt or refer to the Supreme Court's opinion in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Whether the harmless error rule applies to petitioner's due process claim is unclear. However, should the rule be applicable, it would be premature to determine whether the alleged constitutional violation was harmless prior to determining after a hearing, what the nature of the experiment was and whether it constitutes a violation of due process.

A review of the state court record and the briefs submitted to the Appellate Division by petitioner's counsel indicates that petitioner's main argument to the jury and on appeal was that the government had failed to establish the robber's identity beyond a reasonable doubt. Petitioner argued that the different descriptions of the robber given by each of the eyewitnesses established that the stocking was not as sheer as the eyewitnesses had testified it was. Without knowing more about the alleged experiment, this Court cannot conclude that the outcome of the jury's deliberations, which lasted almost six hours, was not influenced by the experiment.

68

stocking for the purpose of testing a witness' testimony that defendant could be identified notwithstanding the stocking. Trial court concluded that the improper experiment was harmless), *with United States v. Hephner*, 410 F.2d 930 (7th Cir. 1969) (Court determined, without conducting an evidentiary hearing, that juror's use of sunglasses and a head covering to simulate robber's disguise was not prejudicial), and *United States v. Callahan*, 442 F.Supp. 1213 (D.Minn.1978), *rev'd*, 596 F.2d 759 (8th Cir. 1979) (District court concluded that jury experiment in which one juror placed a stocking over her head to help evaluate testimony of witnesses at trial was not error, relying solely on language in *Hephner, supra*. Court of Appeals reversed conviction on other grounds and it did not review defendant's allegation that district court erred in not granting him a new trial and in failing to conduct an evidentiary hearing). See generally Mueller, *Jurors' Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b)*, 57 Neb.L.Rev. 920, 962 (1978) ("A party who makes a preliminary showing [of jury misconduct] is entitled to a hearing and in criminal cases the entitlement is of constitutional dimension").

To determine whether the experiment raises a possibility of prejudice to petitioner, this Court must ascertain whether the experiment actually took place and, if so, under what conditions. Although the list which follows is by no means intended to be exclusive, areas of inquiry relevant to the issue to be decided are: (1) how the experiment came about; (2) how many jurors were involved; (3) whether the jurors discussed the results of the experiment and, if so, what was said; and (4) whether the experiment took place before or after the jurors reached a verdict and if the experiment took place before the verdict was reached, at what point in the deliberation it occurred.

It is well-settled that jurors may be questioned about the areas listed above, the occurrence of the experiment and the nature and content of the jurors' communications respecting the experiment, but that

jurors cannot be questioned on how the experiment affected their vote. See, *e. g.*, Rule 606(b), F.R.Evid.; *United States ex rel. Owen, supra; Tobias v. Smith*, 468 F.Supp. 1287 (W.D.N.Y.1979); *Smith v. Brewer*, 444 F.Supp. 482 (S.D.Iowa), *aff'd*, 577 F.2d 466 (8th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978). The question whether prejudice resulted from the jury misconduct must be resolved by the Court by drawing reasonable inferences about the probable effect of the misconduct on an average juror.

"[T]he district court is precluded from investigating the subjective effects of any breach on any jurors, whether such effects might be shown to affirm or negate the conclusion of actual prejudice. Though a judge lacks even the insight of a psychiatrist, he must reach a judgment concerning the subjective effects of objective facts without benefit of couch-interview introspections."

*United States v. Howard*, 506 F.2d 865, 869 (5th Cir. 1975).

Counsel will be assigned to represent petitioner in further proceedings on this application; the Court will contact all parties to set a mutually convenient date for an evidentiary hearing.

SO ORDERED.